(No. 86-CC-1532-

ARCHIBALD COPLAND, Individually and as Special Administrator of the Estate of Scott Copland, Deceased, MARY ANN COPLAND, and KATHLEEN COPLAND, Claimants, v. THE ILLINOIS DEPARTMENT OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES and HOWE DEVELOPMENTAL CENTER, Respondents.

*Opinion filed January 19, 1989.*

ROBERT A. CLIFFORD & ASSOCIATES (RICHARD PULLANO, of counsel), for Claimants.

NEIL F. HARTIGAN, Attorney General (JOHN BUCKLEY, Assistant Attorney General, of counsel), for Respondent.

MONTANA, C.J.

This claim was filed by Archibald Copland, the father and special administrator of the estate of Scott Copland, on behalf of the estate of Scott Copland, deceased, and also on behalf of himself, his wife, Mary Ann Copland, and his daughter, Kathleen Copland Buzen.

Evidence was taken on July 7 and 8, 1988. The record includes a factual stipulation, the testimony of each of the Coplands, exhibits to which the witnesses made reference during the course of the hearing, and certain documents of the Department concerning family visits made to Scott Copland.

The stipulation signed by each party prior to the beginning of evidence included the following facts: Scott Copland was a resident and under the complete care of the Howe Developmental Center in Tinley Park, Illinois, on and prior to April 28, 1985. Scott Copland resided in Quad 3, of the four quads located in Willow Hall at Howe Developmental Center. There were approximately 40 residents living in this quad. Most of these residents were severely mentally and physically handicapped. These residents required 24-hour attention. The technicians assigned to this quad, employees of the Howe Developmental Center, worked eight-hour shifts.

On April 28, 1985, there were six technicians assigned to Quad 3. Each technician was assigned to care for a certain number of the residents. Ms. Mary Ann Townsend was the technician responsible for the care of Scott Copland and several other residents. She had cared for Scott in the past and was familiar with his mental and physical limitations. She knew that Scott was retarded and had the mental capacity of a three year

old. She also knew that Scott was an epileptic, could have seizures at any time and that he was on a prescription medication for his epilepsy.

On the morning of April 28, 1985, certain of the technicians decided to have a barbecue for the residents. This would require someone going to the local food store for the food items. At approximately 9:30 a.m., Ms. Townsend took Scott Copland to the bathroom. Scott had been in a wheelchair. She took him out of his wheelchair and placed him on the toilet. She took a bedsheet that was hanging in the bathroom, wrapped it around Scott's waist, and tied it to the back of the toilet. In effect, Scott was tied to the toilet. She then took Scott's wheelchair, turned it around and pushed the back of the wheelchair up against his legs. She then left Scott Copland alone. At that time Scott had no injuries or bruises on or about his face. It was approximately 15 or 20 minutes later that Ms. Townsend left for the grocery store with technicians Jesse Balasingame and Frances Wiggins. They would be gone approximately two hours. While out, they also stopped at a flea market.

Three technicians remained at Quad 3 during this time period. They were Rita Jones, Homer Talley and Josephine Evans. After the three technicians left for the store, Ms. Jones took three of her residents into a back bedroom where she fell asleep for approximately one-half hour. She awakened when Ms. Evans called out that it was time for lunch. During this same time period, Homer Talley took approximately 10 to 12 residents outside. The residents were allowed to play kickball while Mr. Talley cleaned and started the grill. Josephine Evans was left to care for the remainder of the residents. At no time while the three technicians were gone did Ms. Jones, Mr. Talley or Ms. Evans ever see or check on the status of Scott Copland.

The three shopping technicians returned to the quad at approximately 12:00 noon. When Ms. Townsend got back to the quad, she went to the dining room and realized that Scott Copland was not there. She then walked to the bathroom to check to see if Scott was there. When she arrived, she found Scott sitting on the toilet with his head hanging over the back of the wheelchair. He still had the bedsheet tied around his waist and to the back of the toilet. She lifted his head up and noticed that his face was discolored. It was at this point that Ms. Townsend realized that Scott Copland was dead. She performed no mouth-to-mouth resuscitation or lifesaving techniques. She placed his head down and ran to the dining room to get help. Ms. Evans and Ms. Jones returned to the bathroom with Ms. Townsend. They removed Scott from the toilet and put him in his wheelchair, took him to his bedroom and put him in his bed. The paramedics arrived shortly thereafter and transported Scott to a local hospital where he was formally pronounced dead.

Further evidence was presented through the stipulation regarding a cover-up which was attempted by the employees of the Howe Developmental Center. The Court does not feel this evidence is relevant in evaluating the damages to be awarded to the Claimants.

Mary Ann Townsend was later indicted by a Cook County grand jury and pleaded guilty to one count of abuse and gross neglect of a long-term care facility resident and one count of official misconduct. She was placed on probation. All of these facts have been stipulated to.

The Department of Mental Health and Developmental Disabilities and Howe Developmental Center concede that their agents and employees left Scott

Copland in a totally unattended manner for an excessive period of time after tying him to a toilet with a bedsheet, that they failed to monitor Scott Copland in an appropriate manner and that their negligent acts resulted in the injuries which caused Scott Copland's death on April 28, 1985.

The sole issue remaining for the determination by this Court is the amount of compensation to be paid to the estate of Scott Copland for the survival action and to his remaining family members for their loss as a result of his death. Certain facts are extremely probative on that issue. In order to appreciate the significance, a brief chronology of the deceased's institutional history must be given.

Scott Copland was two years old when testing at the University of Illinois Research Clinic revealed that he had suffered some type of damage to his brain. Eventually, at the age of five, Scott was placed in the Little Angels Nursing Home in Elgin, Illinois. Before that, he lived with his family in Lombard. At the age of six, Scott had to be transferred from Little Angels because of an age limitation. At that point he was taken by his parents to Hynes School in Delavan, Wisconsin, where he remained for a little less than two years. Because of an absence of medical facilities at the Hynes School, it was recommended that he be transferred to another institution with appropriate medical care. He next stayed at the Powell School in Red Oak, Iowa, in 1967 after being home for the complete summer in 1967. The Powell School was approximately an eight-hour drive from the home of the Coplands in Lombard, Illinois. Eventually Scott left the Powell School and took up residence in the Madden Zone Center in Maywood, Illinois. The number of seizures that he was experiencing had increased and the Powell School could no longer

care for him competently. Scott remained at Madden for three months in 1971 until an opening at the Dixon State School allowed him to be transferred there. In 1981 the Dixon State School was turned into a prison by the State of Illinois, and Scott was sent to the Howe Developmental Center in Tinley Park, Illinois, where he resided until the time of his death in 1985.

This history is both relevant and significant in evaluating the loss suffered by Scott's immediate family members as a result of his death. It might be inferred from these facts alone that the separation of Scott from mother, father and sister would have mitigated that loss. The evidence presented proves otherwise.

From the time that Scott was first committed to an institution at the tender age of five until the time of his death, the Copland family took every opportunity to visit with and show their support for Scott. Each of the Coplands testified to the regular trips the family would make to whatever institution Scott was in, often times driving at night and for great lengths of time in order to be with their boy. No matter where Scott was living, the evidence established that the Copland family would visit him, regardless of difficulties involved. Kathleen Copland's vivid memories of the activities on these trips is evidence which is very difficult to reject. In observing the testimony of the Coplands, it is fair to say that they impress a neutral observer as being very, very sincere and honest people. The devotion that they showed to this handicapped boy is very admirable. It also, unfortunately, appears to be unusual when compared with the living conditions under which most handicapped people survive or exist. The Coplands went so far as to purchase a piece of property near the Dixon State facility so that they might have a place for their mobile home, a place where they could take Scott away

from the institution. The State's own records establish that the family was very concerned about his well-being and that this manifested itself by frequent visits and calls. Scott's family contacts and relationships were considered by his therapists to be one of his major assets. Scott's family loved him very much and they have suffered a significant loss by his death. It is no less of a loss simply because he was handicapped and, under the facts of this case, it would be unfair for this Court to evaluate his life or their loss any differently than evaluating the death of a healthy child.

Lastly, the manner of death which Scott suffered has to be evaluated in determining the value of his survival action. The Claimant called Dr. Shaku Teas who is a board certified pathologist, educated at the University of Illinois hospital in Chicago and who works as a pathologist at the Cook County medical examiner's office. She has performed over 3,000 autopsies in her career. She performed the post-mortem examination on Scott Copland on April 29, 1985. She initially did not make a determination as to the cause of death after the autopsy, but testified that she wanted to do some additional investigation. She eventually opined that the cause of death was postural asphyxia combined with seizure disorder and mental retardation.

The doctor explained that the asphyxia, meaning lack of oxygen, was related to the positioning of Scott's body during the time he was tied to the toilet. Her internal examination of Scott's body revealed hemorrhage around the spinal cord in the cervical area and fresh hemorrhage in the muscle area of the neck. The doctor examined the wheelchair and the toilet and re-enacted the sequence of events which led to Scott's death with the cooperation of David Protrowski of the

facility and the Tinley Park police officers who investigated this incident.

Dr. Teas indicated that the injuries which she found and the mechanism which caused these injuries are the same as would be found in someone who has hung himself or who has been strangled. However, in this situation it is the doctor's opinion that the actual period it took to kill Scott Copland ranged somewhere between 5 to 45 minutes. When asked to be more specific, she indicated it was probably somewhere in between those two figures. In effect, the doctor testified that because Scott's functional mentality was that of a young child, he was unable to react properly to remove his head from the back of the wheelchair which had been backed up against him. The pressure on his neck and throat from the top of the wheelchair decreased the blood returning to the heart from the brain and also reduced the blood to the brain. Unfortunately, Scott's sensory system was not impaired in any way and, therefore, the pain that he suffered was not reduced by his handicap. In short, Scott Copland suffered an extremely painful death.

As a result of Scott's death, the Copland family paid a $494 hospital bill for the emergency room services and a total funeral bill of $4,307.

Based on the facts of this case, the nature of the relationship between the deceased and his family members, and the type of death which Scott Copland suffered, the Court concludes that Claimants should

recover the maximum allowable amount of money from the State of Illinois. Accordingly, the estate of Scott Copland is awarded one hundred thousand dollars for his predeath pain and suffering and hospital and funeral expenses. Archibald Copland, the father of the deceased, Mary Ann Copland, the mother of the deceased, and Kathleen Copland Buzen, the sister of the deceased, are each awarded one hundred thousand dollars for the loss of Scott Copland.