(No. 83-CC-1677– )

DAWN SCOTT, SUE E. BROWN, RICHARD OLSON and JANET McMILLAN, Claimants, v. THE STATE OF ILLINOIS, Respondent.

*Opinion filed December 7, 1990.*

HAMM & HANNA, LTD. (RONALD HANNA, of counsel), for Claimants.

NEIL F. HARTIGAN, Attorney General (G. MICHAEL TAYLOR, Assistant Attorney General, of counsel), for Respondent.

## OPINION

RAUCCI, J.

The instant cause of action arose as a consequence of an accident occurring on February 16, 1982, on Illinois Route 98, in Groveland Township, Tazewell County,

Illinois, at approximately 9:50 p.m. Claimants, Dawn Scott and Richard Olson, were passengers in a vehicle owned by Christine Barge and driven by Joseph Warren in a westerly direction on Route 98 at a point approximately 250 feet west of the entrance to Dirksen Park when it came into contact with water which had accumulated on the roadway surface causing the driver to lose control of the vehicle which then collided with a telephone pole and rolled over several times. Claimants, Dawn Scott and Richard Olson, and their respective parents, Sue Brown and Janet McMillan, who paid medical expenses on their behalf, allege that the aforesaid accident was the proximate result of the State's negligent failure to construct the roadway in such a fashion that water would not accumulate on the roadway surface; failure to inspect the roadway from time to time to determine if the aforesaid situation in fact existed; and failure to warn Claimants of a situation which had occurred on numerous prior occasions at the same location and of which the State had actual and constructive notice.

Numerous witnesses were called to testify in these proceedings and the highlights of relevant and material testimony and evidence are as follows:

Rodney E. Wamsley, an Illinois State Trooper assigned to the division of forensic science and identification at the Morton crime lab, was called to testify on behalf of the Claimants. Trooper Wamsley had five years experience as a State Trooper and four years as a Deputy Sheriff in Tazewell County, Illinois, and during the majority of this time participated in the investigation of automobile accidents. On February 16, 1982, at approximately 9:51 p.m., Trooper Wamsley received notification of an accident on Route 98 and proceeded to the location thereof in Tazewell County,

Illinois, near the entrance to Dirksen Park, where he observed an automobile on the north side of Illinois Route 98 facing in a westerly direction. Trooper Wamsley found three individuals in the vehicle, two of whom he identified as Dawn Scott and Richard Olson. After calling for medical assistance and removing the individuals from the wreckage, Trooper Wamsley conducted an investigation of the accident scene which included the taking of measurements and the preparation of a diagram. Trooper Wamsley also examined the tires on the vehicle and stated that all four tires were inflated and three of the tires had no defects while the right rear tire showed some cord but also had tread. He did not recall how much cord was showing, but was certain that the cord that was showing did not go all the way around the tire. Trooper Wamsley explained in detail the measurements depicted in Claimants' Exhibit No. 2 and stated that an area of water two or more inches deep and twenty-five or thirty feet in length covered the entire westbound lane of traffic and encroached upon the centerline and partially into the eastbound lane of traffic, and that the rear of the vehicle in which Claimants were riding came to rest approximately three hundred ninety-one feet from the west edge of the puddle of water which was covering the roadway. Trooper Wamsley returned to the accident scene within the next few days with an accident reconstruction officer to check his measurements and review his report for accuracy and made no corrections at that time.

Trooper Wamsley further stated that he did not recall seeing water on the roadway surface as he approached the accident scene from the west and did not see the water until sometime after he walked from his vehicle which he parked approximately 250 feet west

of the water. He further stated that when approaching the water from the west (the direction Claimants' vehicle was travelling) a number of dips existed in the roadway which could impair the driver's vision of water on the roadway when travelling westbound. Trooper Wamsley did not recall whether or not he had ever seen an accumulation of water at the specific site of the accident on any prior occasion, but he had previously seen puddles of water in both lanes of traffic on Route 98 in the general area of the accident. Trooper Wamsley also stated that, in his opinion, "The amount of water on the roadway, the depth and width of the puddle itself, was a contributory cause in regard to causing the vehicle to leave the roadway subsequently striking the pole and coming to rest in the park."

Trooper Wamsley also stated that hydroplaning is a condition occurring when a small film of water between the road surface and the tire surface causes a lack of steering ability, braking ability or controlling of that vehicle, whereas a greater depth of water, such as in the instant case, causes temporary loss of control of the vehicle itself. On cross-examination, Trooper Wamsley stated that when initially filling out his accident report, he felt speed was a contributing cause to the accident, but no testimony or evidence was provided by him or any other witness, to indicate that the speed of the vehicle was excessive. In fact, Trooper Wamsley stated that he had no reason to believe that the vehicle was travelling at an excessive rate of speed and that the speed limit at the scene of the accident was 55 miles per hour. He further stated that, in his opinion, a vehicle travelling at 55 miles per hour coming into contact with the amount of water he observed on the roadway at the scene of the accident would have caused the vehicle to

pull severely and that even a vehicle equipped with new tires would be adversely affected.

James McKelvey, called to testify on behalf of the Claimants, stated that he had lived approximately 400 yards west of the entrance to Dirksen Park on Illinois Route 98 for 20 years and 400 yards east of the entrance to Dirksen Park for 15 years prior thereto. During that 35-year period of time, Mr. McKelvey had observed an accumulation of water on the roadway surface on State Route 98 in the location of the Dirksen Park entrance on many occasions at all times of the year and at times as much as twenty inches in depth. He was also aware of at least two accidents at this location with other vehicles running into the ditch, but could not state definitely that police vehicles had ever been called to the scene.

Mr. McKelvey testified that in the 1960s he had a conversation with a superintendent of the State Highway Department or crew at the end of the driveway, where Loren Kreps presently resided, and that he recognized the orange colored State of Illinois trucks, with the label on the side, "State of Illinois," as being driven by the individual with whom he spoke. He stated that he advised the individual driving the truck marked "State of Illinois" that he was concerned about his teenage daughter driving on the roadway due to the accumulation of water which was present at the time covering the roadway during this conversation. He stated that this individual advised him, "I can only do and fix what they tell me to." Mr. McKelvey also testified that in the latter part of the 1970s, employees of the State of Illinois worked for several days digging with a backhoe apparently cleaning out a culvert which was under Route 98 at a location approximately 50 feet east of the scene of the Claimants' accident. He stated that

after the work was done the water situation improved for a very short period of time until it plugged up again and that to his knowledge no additional work was done up through February 16, 1982. Based on his own observations during 35 years of living in this locale, Mr. McKelvey believed that water accumulated on the roadway, at this location, because the road is low at that point and water drains from a large amount of farm acreage.

Mr. McKelvey stated that prior to February 16, 1982, no signs warning of water on the roadway, slippery when wet or any other kind of warning signs were located either to the east or west of the location of the accident near Dirksen Park. Mr. McKelvey did indicate that on more than one occasion there were flares put out when water was over the road for an extended period of time, like 10 or 12 hours, but he had no idea who had placed the flares.

Six or seven minutes after the accident occurred, Mr. McKelvey walked in the water on the highway and believed that it was six to eight inches deep in the middle of the road and 60 to 70 feet in length. Mr. McKelvey knew that the water was over the roadway surface approximately one hour and 52 minutes prior to Claimants' accident since his son-in-law and daughter, who visited him, had driven through the water at approximately 8:00 p.m.

The evidence deposition of Loren Kreps submitted in evidence established that since 1968, Mr. Kreps resided on the south side of Route 98 just east of the entrance to Dirksen Park. He stated that whenever it rained two to three inches, Route 98 would flood with water actually covering the roadway surface and that this situation occurred at least once a year. Like Mr.

McKelvey, Mr. Kreps was aware of at least two accidents occurring at this location prior to February 16, 1982, where vehicles hit standing water on Route 98, but he was not aware if police were called to the accidents.

Mr. Kreps stated that he too had a conversation with State Highway Department personnel whose trucks he recognized while they were working on a culvert on Route 98, near the scene of the accident and prior thereto. He attempted to get these individuals to clean out the ditch in front of his house where there was heavy grass so that when the water came through the ditch, it did not go out onto the roadway and flood the road but he was unsuccessful in doing so and was told they could not clean it out unless the engineers okayed it and it wasn't in the format for them to do it. Again, like Mr. McKelvey, he recalled that these individuals cleaned out a big culvert and then dug a ditch into his field with a backhoe.

Prior to February 16, 1982, Mr. Kreps stated that he had personally seen water 10 inches deep or high enough to almost run into a car travelling through the water and that the water would sometimes stay three or four hours before it would run off. Mr. Kreps had never seen any kind of warning signs in the vicinity where the water flooded the roadway.

Joseph Warren testified that he had driven the 1975 Firebird automobile involved in the accident and owned by his mother, Christine Barge, almost every day during the four months prior to the accident but was unable to recall anything about the car or the accident itself as a result of the coma that followed the accident.

Claimant, Dawn Scott, testified that although she had no recall of the events immediately prior to the accident, she had ridden in the same vehicle before and

did not notice any steering, braking or other mechanical defects. Concerning her injuries, Dawn Scott stated that she has not regained full mobility of her right arm and can no longer participate in activities such as bowling or acrobatics and can do very little lifting. She further stated that she is unable to carry a coffee pot with her right hand because her arm goes to sleep or goes dead on her. Claimant also described numerous scars: surgical scars three inches long, on each side of her upper torso, where tubes had been inserted into her lungs; a scar from the top of her shoulder underneath her arm and a small scar on her foot, and two scars on the back of her hand. She also suffered from a loss of sensation from the thumb through the index finger of her hand and the frequent loss of sensation or feeling from her elbow to her fingertips. At the time of trial, Claimant was still being treated by and under the care of Dr. Ronald Palmer and takes prescription pain medication which causes her side effects such as double vision and nausea. She also stated that she continues to have two knots in her chest where her ribs were broken and that her arm has developed arthritis, which is very painful.

Concerning Claimant Dawn Scott's injuries, the evidence deposition of Dr. Ronald Palmer was admitted. Dr. Palmer is a Board Certified Orthopedic Surgeon and Assistant Clinical Professor of Surgery at the University of Illinois, School of Medicine. Dr. Palmer first saw Claimant, Dawn Scott, at the St. Francis Medical Center in the emergency room where she had been transferred from Pekin, Illinois and diagnosed laceration of her right hand, laceration of the side of her face, obvious open fracture of the right proximal humerus and a deformity about the elbow and forearm. He stated that x-rays revealed fracture of the right scapula, open comminuted fracture of the right

proximal humerus, comminuted fracture of the right olecranon with a fracture and dislocation of the right proximal radial head and fracture of the shaft of the right ulna. Dr. Palmer performed debridement and closure of the comminuted fracture of the right proximal humerus and placed her in lateral traction for the fracture of the right humerus. A closed reduction of the fractures of the right forearm and elbow were performed and she was placed in a splint for these fractures. Facial lacerations were repaired by another surgeon. A drain was placed about the shoulder wound to allow blood to drain and prevent accumulation of blood under the skin.

Claimant Dawn Scott was returned to surgery on March 10, 1982, and underwent open reduction and internal fixation of the fracture of the right ulnar shaft and right olecranon and was hospitalized initially from February 17th until April 7th of 1982. During her hospitalization, she was immobilized and prevented from performing her normal bodily functions for approximately one month and during this period of time was administered various narcotic substances to reduce pain. Dr. Palmer stated that the lacerations, blood loss and injuries to her chest were potentially life threatening injuries and all her injuries were significant, in his opinion.

She was readmitted to St. Francis Medical Center on December 14, 1982, at which time the surgical plate and screws were removed from her right ulna and olecranon. During this procedure an incision approximately eight centimeters in length along the outer or lateral side of the elbow was made and a similar incision was made along the long midforearm region. Another scar is located in the right shoulder in the area of the open fracture in addition to the facial lacerations. Dr. Palmer summarized Claimant Dawn Scott's injuries as,

"a scar about the right shoulder with no residual loss of motion of the shoulder. She had a scar about the elbow with significant loss of motion in the elbow. She had a scar in the forearm with decreased motion of the forearm. There's some decreased sensation in the back of the hand and a scar of the hand."

Dr. Palmer also recalled Dawn Scott having some limitation in rotation of the elbow. All of the injuries described by Dr. Palmer were considered by him to be permanent in nature.

Finally, Claimant Scott testified that her parents had paid her medical bills and she had personally received no money from any insurance company as a result of the accident. Exhibit 7 listed medical bills paid by Claimant, Sue Brown, natural mother of Dawn Scott, on behalf of Dawn Scott, in the total amount of $45,691.50.

By way of stipulation, the record reflects that with respect to Dawn Scott and Sue Brown, State Farm Insurance Company paid $15,000.00 under Sue E. Brown's uninsured motorist coverage and an additional $35,000.00 under Sue Brown's underinsured motorist coverage and further that Harco Insurance Group of Milwaukee, Wisconsin, paid $37,066.97 under group medical insurance.

Claimant Richard Olson, testified that he too had ridden in the 1975 Firebird automobile on many occasions prior to the accident and was not aware of any mechanical problems with the car. Like the other occupants of the vehicle, he remembered nothing about the circumstances of the accident itself. He testified that the injuries he sustained in the accident resulted in several hospitalizations and during the first hospitalization of approximately six weeks he remained strapped to his bed due to adverse side effects of the medication he was receiving. He experienced considerable pain during

the initial hospitalization and subsequent hospitalizations when various wires were removed from his body without the benefit of any pain medication.

Prior to the accident, Claimant Richard Olson, participated in football and basketball and believed he had a good chance of playing college football. Due to the accident he was unable to play during his senior year in high school and, in fact, missed the entire last semester of his junior school year. At the time of trial, he was attempting to become an apprentice carpenter but was having difficulty doing so due to back and neck pain resulting from the accident. He also experienced continuous pain in his internal organs such as his liver and lungs and has a scar running the length of his entire upper body in the center of his chest. Like Claimant Dawn Scott, Richard Olson has surgical scars from insertion of tubes and a surgical scar on his neck from exploratory surgery.

Concerning the injuries sustained by Claimant Richard Olson, Dr. James Kenny's evidence deposition was admitted. Dr. Kenny is a general surgeon and teaches surgery at the Peoria Medical School. He first saw Claimant Richard Olson at the St. Francis Hospital Emergency Room where he observed Claimant to already have a chest tube inserted in his left chest. He stated that Claimant Olson had already twice suffered a cardiopulmonary arrest and that he diagnosed a severe chest and abdominal injury, ruptured spleen, multiple hepatic lacerations of the liver and bilateral ruptured diaphragms with herniation of the abdominal viscera into the chest. He also had suffered multiple fractures of the ribs bilaterally and extensive bilateral pulmonary lacerations. His chest was filled with blood from lacerations of the lung and chest wall which seriously

interfered with his respiratory exchange and the large blood loss contributed to shock. Dr. Kenny stated that either the lacerated spleen, lacerated liver or lacerated lungs could be a fatal injury and that transfusions were immediately started at multiple intravenous sites. Subsequently, an incision was made to the abdomen disclosing the ruptured spleen and ruptured diaphragms and the incision was extended on up through the sternum to open the chest giving access to the major injuries and resulting in an incision which ran the length of the entire body. The unique procedure utilized became the subject of an article entitled, *Primary Repair of Bilateral Diaphragmatic Rupture with Crural Involvement* published in the American Journal of Surgery, and Claimant's survival of the injuries and the uniqueness of the procedure made it worthy of publication.

Dr. Kenny repaired Claimant's lacerated liver and removed the ruptured spleen. The large lacerations in both lungs were repaired and the jagged fractures of the ribs were repositioned as well as possible and the diaphragmatic injuries on both sides were repaired and the incisions were then closed with the drainage tubes remaining in his chest.

With regard to removal of the spleen, Dr. Kenny testified that it is an important human organ which contributes to defense against infection and that Claimant may be more prone to infection as a result of the loss of the spleen. Dr. Kenny stated that the injuries suffered by Claimant would most certainly have resulted in significant pain and that he was in intensive care for approximately 12 days and then hospitalized for an additional 30 days thereafter. He further stated that Claimant also underwent an exploratory laparotomy

and suffered irritation of his vocal cords and pericarditis or inflammation of the sac around the heart. Claimant was readmitted to the hospital after his initial discharge on two different occasions for two separate surgical procedures and then was thought to have contracted hepatitis from the multiple blood transfusions at the time of his initial hospitalization. Dr. Kenny described Claimant's primary scar as a long midline scar from the suprasternal notch clear down to his pubis. In all, Claimant underwent four hospitalizations and numerous surgical procedures including one radical procedure and Dr. Kenny characterized his survival of the accident as "miraculous."

Also, as in the case of Dawn Scott, Claimant Richard Olson's parents had paid his medical bills and Claimant, himself, had never received any proceeds from any insurance company. Exhibit 7 lists medical bills paid by Claimant, Janet McMillan, natural mother of Richard Olson, in the total amount of $57,027.58.

With regard to Claimants Richard Olson and Janet McMillan, the record reflects a stipulation that State Farm Insurance Company paid $25,000.00 in uninsured motorist benefits and $30,000.00 in underinsured motorist benefits under Janet McMillan's auto insurance coverage.

The only witness called on behalf of the Respondent was Nelson Teichman, maintenance services and development engineer for the Illinois Department of Transporation, District 4 of Peoria. Mr. Teichman has held that position for approximately 10 years and stated he was acquainted with the handling of complaints concerning roads in the district. He described the manner of handling written complaints and stated that a file is maintained with regard thereto. He also indicated

he was familiar with telephone complaints and the manner of handling same and indicated that there is a form filled out and again a file of such recorded telephone complaints is maintained. Mr. Teichman also stated that there exists a radio system where field trucks can radio into the department and from time to time observations from people in the field regarding problems with a particular stretch of road are made to the district radio dispatcher who keeps a log of such reports, such as stop signs down, road signs down, or potholes. Mr. Teichman indicated that he had reviewed the file that would contain written and telephone complaints for the year 1982 and found no such complaints pertaining to standing water on Route 98 near Dirksen Park. He also indicated that he reviewed the radio logs for February of 1982 and found no reports or observations of standing water on Route 98 near Dirksen Park.

On cross-examination, Mr. Teichman acknowledged that maintenance is performed on roads from time to time without complaints having been made and received by his department. He also stated that he had not checked any records or files for complaints concerning standing water on Route 98 for any year other than 1982 although he acknowledged that records of such complaints might be available dating back to 1978 or 1979 and possibly longer. Mr. Teichman acknowledged that he had no way of knowing whether in fact a complaint of any sort had been recorded for water on Route 98 near Dirksen Park if the complaint was made prior to 1982. Although Mr. Teichman acknowledged that field engineers or foremen have assignment sheets kept on a weekly or daily basis for maintenance work which is done, he had no idea whether such records are maintained or for what period of time.

Concerning any system of inspections, Mr. Teichman stated that the only system of inspections wherein records were kept or maintained was in conjunction with municipal maintenance agreements, for a few cities, which by agreement maintain highways for the State. He indicated however that Route 98 was not such a roadway. Mr. Teichman acknowledged that the records of complaints would not include every single telephone call but he did believe it would contain all written complaints.

Finally, when asked about complaints made to crew workers or field engineers on the site where they are working, Mr. Teichman "guessed" that they "might" be radioed and they "might" be transmitted by word of mouth from a crew member back to the foreman or field engineer. He also acknowledged that they might not get recorded at all. Finally, Mr. Teichman testified that there was "probably" a general practice of employees observing conditions that need correction but that there was no specific inspection crew assigned to inspect a particular stretch of roadway.

Upon inquiry by the Commissioner, Mr. Teichman stated that he was acquainted with a procedure whereby accident reports from the State Police involving roadway defects are reported to the Department of Transportation. However, Mr. Teichman did not know what specific department within the Department of Transportation would receive such reports and speculated that perhaps safety and claims or the traffic department might receive such reports. In spite of the fact that Trooper Wamsley testified that a roadway defect was referenced on his police report and that such report would have been sent to the Department of Transportation and further in spite of the fact that Mr.

Teichman was the maintenance services and development engineer and had checked the records for 1982, no record or report pertaining to the February 16, 1982, defect in the roadway condition had been found.

In this action based on negligence, Claimant had the burden of proving by a preponderance of the evidence that the State was negligent in constructing, maintaining or inspecting the roadway at the location where Claimants were injured or failed to warn of the dangerous condition that existed, and that the State had actual or constructive notice of the condition.

During the trial of this cause, the State suggested during opening statements and examination of witnesses that flooding of the roadway may have been a freak accident or an unusual circumstance due in some way to the alleged accumulation of snow on the ground which presumably would have resulted in run off from heavy rain whereas no snow or unfrozen ground would have absorbed rainfall more readily. That argument might have merit if this road had been constructed in some area of the country where snow and frozen ground followed by rain is a freak occurrence. We take note that in central Illinois it is certainly not uncommon for rain to fall on frozen or snow covered ground and that reasonable care requires the construction and maintenance of roadways in anticipation of such an event. Furthermore, the National Weather Service climatic data which was offered by Claimants reveals that the precipitation that had fallen in the 24 hour period on February 16, 1982 totaled only .46 inch and came as drizzle or light rain in the eight-hour period prior to the accident in amounts of .03 inch per hour, .05 inch per hour, with the heaviest being .08 inch per hour at a time five hours prior to the accident. Respondent failed to

offer any evidence to indicate unusually heavy rainfall caused the road to flood.

Notwithstanding the lack of significant precipitation the existence of a puddle or a pool of water covering at least one entire lane of traffic and encroaching upon the other and covering an area of a minimum of 25 to 30 feet and a maximum of 60 to 70 feet at a depth from two inches to eight inches was clearly established by Trooper Wamsley and Mr. McKelvey. Furthermore, it is clear that this condition existed at the time of the accident and for at least one hour fifty-two minutes prior thereto when Mr. McKelvey's daughter travelled through the same puddle.

It was also established through the State's own witness, Nelson Teichman, that no system of inspection was in effect to examine the roadway to determine the possibility of dangerous conditions. If the State was unwilling or unable to properly construct or maintain the roadway to avoid the development of hazardous conditions thereon, at the very least, a sign such as, "Slippery when Wet," "Water on Pavement" or the like warning of such possible conditions should have been used where such intermittent conditions are a very real possibility and hazard to motorists.

Claimants also had the burden of proving that the negligence of the State was the proximate cause of the accident resulting in Claimants' injuries. The Respondent contended at trial, that an allegedly defective tire or speed of the Claimants' vehicle was the proximate cause of the February 16, 1982, accident. No evidence was offered by the State to in any way indicate excessive speed of Claimants' vehicle. In fact, Trooper Wamsley testified that he had no opinion as to the speed of the vehicle prior to the accident nor any evidence what-

soever to indicate that the vehicle was travelling at an excessive speed.

With regard to the State's contention that a defective tire caused or contributed to the accident, Trooper Wamsley testified that the right rear tire had some cord showing, but that it was not devoid of tread. He further testified that even a vehicle with new tires could have lost control when encountering the amount of water present on the roadway at the scene of the accident. There is no support for the State's contention that the Claimants' vehicle hydroplaned due to one allegedly defective tire. Trooper Wamsley testified that hydroplaning is a condition that occurs when there is a film as opposed to a puddle of water on the road surface and there is no evidence in the record to indicate that hydroplaning or a defective tire was the cause of this accident.

The record is also void of any evidence that any other mechanical difficulty of the Claimants' vehicle may have caused or contributed to the accident. It is also clear that water on the roadway surface was not a hazard visible to Claimants and could therefore not have been avoided with the use of reasonable care. Trooper Wamsley did not see the water as he approached the scene of the accident from the opposite direction and natural terrain features and the grade of the roadway would have prevented Claimants from observing the water from their direction of travel until it was too late to take evasive action.

For all the above stated reasons, the Court concludes that the accumulation of water on the roadway surface and nothing else was the proximate cause of the accident which resulted in Claimants' injuries.

Claimants have the burden to establish that the State had actual or constructive notice that the roadway was constructed or maintained in such a fashion that during periods of normal precipitation in central Illinois, water was likely to accumulate on the roadway surface. The Court finds that this burden has been met through the testimony of Trooper Wamsley, Mr. McKelvey and Mr. Kreps.

The Court also finds that Claimants have established that the Respondent had constructive notice of the dangerous condition since from all the surrounding circumstances the Respondent should have been aware of the existence of the condition in the exercise of due diligence. (*Joyner v. State*, 22 Ill. Ct. Cl. 213, 217; and *Wagner v. State*, 32 Ill, Ct. Cl., 50, 55.) The testimony of Mr. Kreps and Mr. McKelvey established that the condition of flooding on Route 98 had occurred for 30 or more years, at all times of the year and at times with water reaching 20 inches in depth. At least two other accidents had occurred at that location and at least on one occasion flares had been placed on the roadway where the water was present for 10 or 12 hours. Work was done by State employees at this location in the 1960s and 1970s, which included cleaning of culverts and ditches and digging of ditches into the fields. Complaints were made directly to State employees. Respondent's contention of no notice is contrary to the evidence presented.

Evidence was offered by Respondent to show that no complaints in writing, by telephone, or through radio dispatchers were made of this condition during the one year prior to the accident. However, no evidence was offered to show that direct complaints were not made to State employees nor that work was not done before and

after the accident at the location to alleviate the dangerous condition that existed. Nor was any evidence offered to show how or why the Respondent elected to install a new culvert after the accident if they had no knowledge of the dangerous condition before or after. The Court finds that the evidence overwhelmingly establishes that Respondent should have been aware of the existence of these conditions in the exercise of due diligence.

The sole remaining issue is the damages claims by Claimants and the question of "set offs."

Claimant Dawn Scott sustained very serious and permanent injuries, scarring, and endured great pain and suffering. Claimant Richard Olson also sustained serious and permanent injuries, disfigurement, and endured great pain and suffering. We find that each of them is entitled to the maximum award allowed by law, $100,000.00. See section 8(d) of the Court of Claims Act. Ill. Rev. Stat., ch. 37, par. 439.8(d).

This Court previously decided in *Pigott v. State* (1986), 41 Ill. Ct. Cl. 216, that the $100,000.00 limitation applies to each person who has a cause of action. We followed that decision in *Copland v. State* (1989), 41 Ill. Ct. Cl. 125. At the time of the accident in this case the victims were minors. At the time the complaint was filed the victims had reached majority and brought their cases in their individual capacities. The mothers of the victims filed their claims for recovery of medical expenses they incurred. A separate count in the complaint was included for each mother in her individual capacity. The obligation to pay necessary medical expenses of a minor lies with the parent and the cause of action to recover those expenses belongs to the parent. (*In re Estate of Adam Steven Hammond v. Aetna Casualty Co.* (1986),

141 Ill. App. 3d 963, 96 Ill. Dec. 270; *Peter Reimers v. Honda Motor Co., Ltd.* (1986), 150 Ill. App. 3d 840, 104 Ill. Dec. 165.) Because each mother has a separate cause of action, her claim is not barred or offset by the $100,000.00 to be awarded to her child.

Dawn Scott's mother, Sue Brown, incurred medical bills in the amount of $45,691.50 and the bills were paid by Sue Brown. The record reflects that State Farm Insurance Company paid $15,000.00 in uninsured motorist benefits and an additional $35,000.00 in underinsured motorist benefits, both as a consequence of a contractual obligation to Sue Brown. The record also reflects that Harco Group of Milwaukee paid $37,066.97 under group medical insurance.

Richard Olson's mother, Janet McMillan, incurred and paid medical expenses in the amount of $57,027.58. State Farm Insurance Company paid $25,000.00 in uninsured motorist benefits and an additional $30,000.00 in underinsured motorist benefits pursuant to an insurance contract with Janet McMillan.

The Respondent claims a set off for the sums paid under the insurance coverage.

The record reflects that neither Dawn Scott nor Richard Olson have ever received any proceeds from any insurance carrier or any other source as a consequence of injuries sustained by them in this accident. Richard Olson could not have received any sums in view of the fact that his medical bills exceeded the sums paid under his mother's auto insurance coverage. Although Dawn Scott could theoretically have received funds from her mother's insurance carrier, it is unrefuted that she in fact did not and it is certainly plausible that Harco Insurance Group of Milwaukee may well have been

subrogated to the extent of sums paid on behalf of Dawn Scott. In any event, it is clear from the record that none of the sums paid came from any source other than those created by Claimants, Sue Brown and Janet McMillan, through their respective automobile insurance policies.

Since this case was tried, briefed, and argued before the full Court, we have held that section 24—6 of the Court of Claims Act (Ill. Rev. Stat., ch. 37, par. 24—6) authorizes common law set-offs and deductions of monies previously received by the injured from the State and other tort feasors, but does not abrogate the collateral source rule, and amounts recovered from one's own insurance contract are not to be set off. (*Sallee v. State* (1990), 42 Ill. Ct. Cl. 41.) Our holding in *Sallee* applied prospectively to all claims pending at the time of the decision and this claim was pending. (See also *Pessin v. State* (Orders entered November 19, 1987 and February 25, 1988); *Paschal v. State* (1991), 43 Ill. Ct. Cl. ___; *Fejes v. State* (Order filed February 2, 1990).) We therefore find in favor of the Claimants on the issue of set offs.

It is hereby ordered that:

1. Dawn Scott be, and hereby is, awarded the sum of $100,000.00;

2. Richard Olson be, and hereby is, awarded the sum of $100,000.00;

3. Sue Brown be, and hereby is, awarded $45,691.50;

4. Janet McMillan be, and hereby is, awarded $57,027.58.