(No. 86-CC-0266—

TAFT SMITH, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed August 9, 1994.*

GOLDSTEIN, GOLDBERG & FISHMAN (ROBERT COHEN, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (DIANN MARSALEK, Assistant Attorney General, of counsel), for Respondent.

OPINION

Frederick, J.

This is a tort action filed by Claimant, Taft Smith. Most of the facts are not in dispute. On November 2, 1984, Claimant was admitted to the John Madden Mental Health Facility. This mental health facility is under the control of the Illinois Department of Mental Health and Developmental Disabilities.

Claimant recalled being admitted to the facility when the police brought him there on November 2, 1984. Claimant does not recall giving permission to admit him to the facility but the evidence shows he voluntarily signed in. He recalls being placed in the quiet room of Pavilion Two on that morning because he had created a disturbance by knocking pumpkins off a counter. He remained in the quiet room in full-leather restraints throughout the day. He was without clothing while he was there. Claimant remembers getting out of the restraints the next morning, on November 3, 1984, and a security guard putting the same restraints back on and then removing the restraints again. He recalls leaving the quiet room with nurse Parikh, returning there and then fighting with her. He escaped the pavilion by throwing a bench through a plate glass window. He was returned by the

Maywood police department to the facility. He was then placed back in the same quiet room with the same restraints. No other restraints were placed on Mr. Smith. When breakfast was brought to Claimant by a Mr. Pal, Mr. Pal removed the restraints around Claimant's right hand and then Mr. Pal returned to retrieve the breakfast tray. Mr. Smith escaped from the restraints, pushed Mr. Pal aside, and left through the unlocked door to the outside. Mr. Pal chased after Claimant. Claimant recalls losing his balance at the top of the stairs when Mr. Pal was reaching for him. He remembers seeing a bone sticking through his right leg and a doctor coming to his aid.

Claimant was taken to Loyola Foster McGaw Hospital where Dr. Mark Lorenz performed surgery on his legs. Claimant's legs were placed in casts and he was in traction during the remainder of his stay. Claimant remembers being transferred to Cook County Hospital where the casts were removed until another operation was conducted on his right ankle. Later, while still in the hospital, he was treated by whirlpool therapy and exercises to teach him to walk. Claimant recalled going back to Fantus Clinic for dressing changes, whirlpool treatment and physical therapy. He recalls beginning to walk with the use of a walker and then with crutches. Claimant began to learn with a therapist how to walk with a cane about ten months later. Claimant testified that the farthest he now walks is from his house to the street in front. Claimant also testified that his hospital bills were paid. Claimant denied having any prior injuries to his legs.

Mr. Smith testified that he was 45 at the time of the hearing and lived in his own apartment. While testifying, he was under medications. At the hearing, he complained of constant pain in his right ankle and left knee. He stated that he had difficulty keeping his balance and suffered

severe pain when standing to walk. He testified that the longest period of time that he could stand without pain was ten minutes.

Mr. Pal testified that on November 3, 1984, he was in his fourth year as a staff psychologist at the John Madden Mental Health Facility. Mr. Pal testified that the facility did not use straightjackets or handcuffs to restrain patients. Mr. Pal testified that there were two rooms used to restrain and seclude patients, called the quiet room, at Pavilion Two. Those patients were routinely checked every hour.

On November 3, 1984, Mr. Pal volunteered to work. His duties were assigned to him by the nurse in charge, a Joan Culbertson. He arrived at the facility at about 8:00 a.m. and spoke to the nurse from the previous shift, Lillian Parikh. He recalls her informing him that Mr. Smith had escaped from the full-leather restraints, that he had been taken from the quiet room, returned to the same room with nurse Parikh, and that Claimant had attempted to strangle her there. Further, Ms. Parikh informed Mr. Pal how Mr. Smith then succeeded in escaping the facility. Mr. Pal also recalled that another patient had a seizure for about 15 minutes at the same time he arrived at the facility. Mr. Pal did not help with that patient but instead was instructed to serve Mr. Smith breakfast. Nurse Culbertson told Mr. Pal to take Mr. Smith a breakfast tray while Mr. Smith was in full-leather restraints in the quiet room. At 8:15 a.m. Mr. Pal, under instructions from Mrs. Culbertson, served Mr. Smith his breakfast tray and removed the restraints from Mr. Smith's right hand so that he could feed himself.

Later that same morning, Mr. Pal was instructed by nurse Culbertson to go to retrieve the breakfast tray. Mr. Pal observed three of the restraints attached to Mr.

Smith's left arm and legs as he entered the quiet room, but did not see the two remaining restraints because of a sheet covering Claimant's body. As Mr. Pal stepped into the room, Claimant jumped up from the bed, pushed Mr. Pal aside, and ran from the quiet room. Claimant ran naked down the hallway and through the nurses' station. Mr. Smith exited Pavilion Two through an unlocked door. As a general rule, that door was the only door that was kept unlocked.

Mr. Pal saw no security guards present at the pavilion at the time of Mr. Smith's escape. He chased after Claimant and came within 50 feet of Mr. Smith. He saw Mr. Smith descending stairs leading to Frontage Road. He did call for Claimant to stop. Mr. Pal testified that when he got to the top of the stairs, he saw Mr. Smith lying at the bottom of the stairs with an open fracture to his right ankle.

Nurse Joan Culbertson testified to being the charge nurse at the facility on November 3, 1984. She knew Mr. Smith from his prior treatment at the facility. She worked the same shift as Mr. Pal and saw Mr. Smith in restraints when she arrived. She heard of Mr. Smith's escape from the restraints. She testified that the door adjacent to the nurses' staff was kept unlocked during the day. She confirmed that one method of restraining patients in the quiet room was to double the restraints so that twelve restraints were used. She recalled checking Mr. Smith's restraints when she arrived on shift and that Mr. Smith tried to get her to loosen the restraints. She indicated that the routine was for Mr. Pal to check Mr. Smith every 15 minutes.

Dr. Felix Panahon was a staff physician at the facility on November 3, 1984. He testified that only physicians could order the implementation or removal of leather

restraints. Nurses had no authority to order the removal of restraints. The quiet room was reserved for patients who were either agitated or violent. He recalled finding Mr. Smith at the base of the stairs, naked and with an open fracture of the right ankle and gross deformity of the left knee.

Dr. George DeSadier, director of admissions of the facility, testified that in determining when to admit a patient in 1984, the factors to be considered were first, whether the patient could care for himself and second, whether the patient was dangerous to himself or others. He stated that the patient was asked to sign a voluntary admission form to show his willingness to be treated at the facility. If a patient is away from the facility on an unauthorized absence, upon his return to the facility he would be taken back to the same pavilion from where he had escaped. He testified that Mr. Smith was a voluntary admission based upon Mr. Smith's signature on the voluntary admission form.

Mr. Jerry Russell, the security chief for the facility, testified that no exterior fences or gates existed at the facility on November 3, 1984. He testified that no security guards were on station at each pavilion. There was not enough money to support that much staff. He acknowledged that if he came on shift after an individual had escaped from the facility, he would not assign any additional security to that patient or suggest further restraints, although he indicated that he had the authority to make recommendations to the psychologist of the unit to add restraints. He testified that his security officers did assist in the application and removal of restraints if requested to do so.

In the 10 years prior to Claimant's admission to the John Madden Mental Health Facility on November 2,

1984, he had been admitted to other facilities and Madden's on 16 different occasions. Claimant's most common diagnosis was schizophrenia paranoia. The inpatient admission forms indicate that Respondent was aware on November 2, 1984, that Claimant was brought to the facility by the police because he had torn up his home. It is noted that Mr. Smith had a lengthy psychiatric history, was viewed as manipulative, and was interviewed while in full-leather restraints. On the admission form bearing Claimant's signature, it was noted that Claimant was not suitable for informal admission because he had torn up his house, threatened to hurt everyone, and had broken dishes. The facility discharge summary indicates that upon admission, Mr. Smith was distorting events about his behavior prior to his admission. The notes also show that nurse Parikh, who Mr. Smith attempted to choke, was pressing charges against Claimant and that Mr. Smith should not be readmitted to Pavilion Two until the charges were resolved.

On the handwritten admission form dated November 2, 1984, at 4:00 a.m., it is stated that Claimant was naked except for a robe he was wearing, that he did not want to be there, and that he denied PCP abuse. The notes also relate that officer Merrill called advising, "Do not underestimate individual * * * he has quick temper * * * and patient's family lives in fear." Mr. Smith is described as wearing a robe and handcuffs. Mr. Smith's admission diagnosis for November 2, 1984, at 4:45 a.m. lists a diagnosis of intermittent explosive disorder. Mr. Smith was taken to Pavilion Two in handcuffs.

Claimant's first medication by a physician on November 2, 1984, included Thorazine four times daily. He was further ordered to be placed in full-leather restraints for eight hours or less beginning at 7:15 a.m. on November

2, 1984. He was also given another tranquilizer by physicians' order on November 2, 1984, being Haldol four times daily. Later that day, at 3:15 p.m. and 11:15 p.m., he was again ordered into full-leather restraints with an additional dosage of Haldol. Claimant's medical chart indicates that on November 2, 1984, he was given Haldol and Thorazine on four occasions beginning at 7:00 a.m. Claimant's only medication on November 3, 1984, was at 8:15 a.m. when he was given one dose of Haldol.

The nurses' notes indicate Claimant was placed in full-leather restraints for throwing pumpkins on the floor. At 12:30 p.m., security helped the staff take Mr. Smith to the bathroom and return him to full-leather restraints. Security again helped Mr. Smith to the bathroom at 3:50 p.m. A notation is made at 11:15 p.m. that Mr. Smith remained in full-leather restraints because of unpredictable behavior and that he was dangerous to himself and others. By midnight it was noted that he had removed the full-leather restraints and security was called to reapply them. The staff notes continue with entries at 5:45 a.m. on November 3, 1984, and indicate that Mr. Smith removed the full-leather restraints a second time. Mr. Smith stated that he wanted to return to his room and did so. Five minutes later, he returned to the quiet room and attempted to choke nurse Parikh and ran through the unit. He threw a bench through a window and escaped from the building. Claimant was returned and placed back into the quiet room in the restraints at 6:30 a.m., after being captured by the Maywood police.

Mr. Smith's diagnosis was redefined by a staff physician on November 2, 1984, as impulse control disorder, acute severe in cyclothymic personality disorder.

The facility requires that its personnel keep entries on restraint/seclusion record forms. On the first form

reflecting Claimant's stay, it is indicated that by 7:15 a.m. Mr. Smith was placed in the quiet room and remained there through 3:15 p.m. Claimant had his right hand loosened for breakfast but not for lunch. He was continued in restraints for eight additional hours from 3:15 p.m. through 11:15 p.m. because it was noted that he was unpredictable and unmanageable. He was shouting and fighting with security as they put him back into restraints. He was served dinner without having his right hand loosened. He spent that evening in restraints and was escorted by security to the bathroom at 10:15 p.m. By 11:15 p.m., he was returned to restraints for another eight hours by physician order because he continued to be unpredictable and unmanageable.

At 5:15 a.m. he removed the restraints again and security helped reattach them. At 5:45 a.m. he removed his restraints for a third time, left the quiet room, and then attacked nurse Parikh. He was returned by security and placed into the restraints in the quiet room. By physician order he was placed back into the restraints for a period to last eight hours. He was served breakfast at 8:15 a.m. and given Haldol with the assistance of security at 8:30 a.m. He then escaped the restraints for a fourth time at 9:30 a.m.

Additional documents note that nurse Culbertson freed Claimant's right hand so that he could feed himself breakfast but that he was still bound by five restraints at the time. Later examination of the quiet room by Mr. Pal showed that the bolts that held the bed down were shaken loose and that Claimant had slipped from the restraints.

Mr. Smith was taken by ambulance and admitted to the emergency room at the hospital on November 3, 1984, at 9:35 a.m. Claimant had an open fracture at the

right ankle with a possible left knee fracture. Pain medication was prescribed by the assigned orthopedic surgeon, Dr. Mark Lorenz, as well as an IV, ice, antibiotics and splints to both right and left legs. Additional pain medication was prescribed along with a dose of Haldol before Dr. Lorenz scheduled surgery for that afternoon. X-rays taken on November 3, 1984, of the left knee showed a "markedly comminuted fracture of the proximal tibia involving the articular surfaces. There were also multiple small bony fragments in the region." The x-rays of the right ankle were found to reveal a markedly comminuted fracture of the distal fibula and tibia. The fractures involved the articular surfaces. There were multiple small bony fragments in the region. Also noted are soft tissue lacerations. Dr. Lorenz performed an open reduction surgery on Mr. Smith's right ankle. His operative report indicated that he found "severe comminution" upon entering Mr. Smith's right ankle. Because of the size of the opened wound and the instability of the ankle, the doctor inserted a large pin and attached it to another pin in order to secure the bones in proper alignment. Dr. Lorenz placed a similarly large pin in Mr. Smith's left foot to correct the knee fracture by the use of traction. Mr. Smith was sent to the recovery room with his legs in traction.

Further x-rays revealed that the fracture lines were still evident on November 19, 1984. On November 20, 1984, a second operation was conducted by Dr. Lorenz under general anesthesia. Additional pins were inserted by Dr. Lorenz into Mr. Smith's right tibia. Mr. Smith remained at Loyola Hospital for one month before being transferred to Cook County Hospital. Mr. Smith remained in Cook County Hospital as an in-patient from December 4, 1984, until December 18, 1984. The x-ray report of

July 11, 1985, indicates a finding of "mild post traumatic degenerative type arthritis to the left knee." The findings in the right ankle indicate "marked distortion and deformity in the ankle joint due to past trauma."

The Respondent has a duty to exercise reasonable care in the restraining and controlling of dangerous insane persons committed to its custody so that they will not have the opportunity to inflict foreseeable injury upon themselves or others. *Houston v. State* (1977), 32 Ill. Ct. Cl. 143.

To prevail, Claimant must prove that the Respondent breached its duty owed to Claimant and that Respondent's breach was the proximate cause of his injury and that the injury was foreseeable. Comparative negligence will also be applied. *Houston, supra*; *Walker v. State* (1982), 35 Ill. Ct. Cl. 583.

In *Walker, supra*, this Court found that the State failed to use due care in rendering treatment to a senile patient, that the State's negligence was a proximate cause of patient's escape and subsequent injury when he jumped from an unlocked third story window as the evidence showed that the Respondent's personnel were aware of the patient's tendency to escape and security measures to prevent escape were not adopted. The patient in *Walker* was 76 years of age. He was admitted to the Illinois Public Health Hospital in Chicago with a diagnosis of senile and confused. He was placed on the fifth floor geriatric unit. The patient attempted several times to leave the facility by the elevator. The hospital was warned by the patient's family that the patient must be watched carefully as he had a tendency to run away. Later the patient was missing. The patient was found lying on the ground outside the hospital's east windows. One window was open and the blinds torn. The window had no lock, bars or protective screen.

The claimant in *Walker, supra,* called an expert witness who testified that it was foreseeable that a confused geriatric patient with a longing to go home might be able to leave the ward. The expert also testified that the security system at the hospital was inadequate, relying too much on human control and not enough on mechanization. He further testified other facilities had a much higher degree of mechanized security. The Court found that the injury to the patient was foreseeable.

The Claimant in the present case did not call an expert witness. However, it is clear from the evidence that the State breached its duty to Claimant, that the injury was foreseeable, and that Respondent's negligence was a proximate cause of Claimant's injury. There is no question that the State knew that Claimant was violent and had attempted to escape and actually escaped prior to the final attempt to escape wherein he was injured. Without a doctor's order the restraints on one hand were loosened and Claimant was left alone. There is also no question that security was inadequate at the facility due to understaffing. Respondent was negligent in failing to protect Claimant from his human tendencies. He had slipped from the restraints three times and had effectuated one escape prior to the attempted escape where he injured himself. He had attempted to choke one employee. Security had helped on a prior occasion at mealtime and Claimant had been fed with restraints on a prior occasion.

It is not necessary for Respondent to have foreseen the exact circumstances of the rendering of harm to Claimant for the harm to have been the proximate result of negligence. It is not essential for foreseeability that the person charged with negligence should have foreseen the precise injury which resulted from his act. *Neering v. Illinois Central Railroad Co.* (1943), 383 Ill. 366.

In this case it was foreseeable that Claimant would attempt to escape and that such escape attempt by a naked, insane person might very well result in injury. The Claimant was injured as he was running from Mr. Pal as he tried to escape.

The Claimant has provided undisputed evidence of his injury due to his uncontrolled descent of the stairs at the facility on November 3, 1984. He went through multiple reduction surgeries and remained in casts and traction for 30 days. His treatment continued for two more weeks as an inpatient and then for ten months as an outpatient. His medical bills were paid and thus are presumed reasonable. All of the pain and disability that Mr. Smith testified about is uncontradicted. However, there was no medical corroboration or testimony concerning future pain and suffering and future disability. Under the law, Mr. Smith is entitled to recover, considering the nature and extent of his injuries, damages for pain and suffering, disability, and past medical expenses. His medical bills totaled $23,972.01. The x-ray report from 1985 indicates marked deformity and post-traumatic arthritis. He lives with pins in both extremities. He cannot ambulate any distance, uses a cane for walking, and cannot stand for any period of time longer than ten minutes.

For all of the above reasons and authorities cited, it is the order of this Court that Claimant, Taft Smith, is awarded $23,972.01 for medical bills, $20,000 for all pain and suffering, $15,000 for all disability, for a total of $58,972.01. The Respondent is granted a set-off for the $23,972.01 paid by the Respondent for medical bills. This is not a collateral source as the payment was by the party. *Scott v. State* (1990), 43 Ill. Ct. Cl. 85.

Therefore, it is ordered that Claimant, Taft Smith, is awarded $35,000 in full satisfaction of his claim.